## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ESTATE OF RONALD SINGLETARY**, | : | Case No.   19-cv-190-JMY |
| **et al.,** | : | |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.** | : | |
| | : | |
| *Defendants* | : | |

## <u>MEMORANDUM</u>

**YOUNGE, J.**                                                      **NOVEMBER 10, 2021**

      Plaintiffs Aminah Singletary and Letiesha Singletary, the personal representatives of the

Estate of Ronald Singletary, brought this civil rights action under 42 U.S.C. § 1983 and

Pennsylvania state law against the City of Philadelphia (the "City"); Police Officers Robert

Schutte, Michael Navedo, Jennifer Grisham, and Owen Schaeffer (collectively, "Defendant

Officers"); and former Police Commissioners Charles Ramsey and Richard Ross (the

"Commissioners") for the fatal shooting of Plaintiffs' brother by one of the Defendant Officers.

Plaintiffs allege that the Defendant Officers used excessive force when, in violation of a City

policy directive, they violently confronted decedent Ronald Singletary, who was barricaded in

his bedroom, leading to the fatal altercation.  Relatedly, Plaintiffs allege that the Defendant

Officers are liable under Pennsylvania law for assault and battery.  They also allege that the City

is liable for failure to train and that the Defendants' conduct amounted to a "state-created

danger."

      Now before this Court is Defendants' Motion for Summary Judgment.  In their motion,

Defendants argue that the Defendant Officers' conduct did not amount to excessive force, and

that even if it did, they are immune from liability under the doctrine of qualified immunity.  They

further argue that the City is not liable for any *Monell* claims under a failure to train theory[1] and

that the Defendants are not liable under a "state created danger" theory.  Finally, they argue that

Plaintiffs' state law assault and battery claims are barred under the Pennsylvania Political

Subdivision Tort Claims Act, 42 Pa.C.S. § 8550.[2]  The Court finds this matter appropriate for

resolution without oral argument.  *See* Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth

below, the Court grants in part and denies in part the Motion.

## I.   BACKGROUND[3]

### A.  Factual Background

Decedent Ronald Singletary was fatally shot by Defendant Officer Schutte on May 12,

2017.  (ECF No. 1, Compl. ¶¶ 26-49.)   Before his death, Singletary lived in and managed a

boarding house located at 1244 S. 51st in Philadelphia, Pennsylvania. (Compl. ¶ 6; Amend. Ans.

¶ 6.)  Singletary had a tumultuous personal relationship with Regina Clozie, who was believed to

suffer from drug addiction and mental illness.  (Compl. ¶¶ 7-8; Amend. Ans. ¶¶ 7-8; ECF No.

53-2, at 5; ECF No. 50-6, at 4.)  Clozie and Singletary would often argue, and Clozie had sought

---

[1]     Plaintiffs do not oppose the dismissal of *Monell* claims against the City of Philadelphia under a policy, practice or custom theory or the claims against Commissioners Ross and Ramsey. Therefore, the Court grants Defendants' Motion for Summary Judgment as to these claims.

[2]     Defendants also argue that Plaintiffs' count under Pennsylvania's Wrongful Death and Survival Act, 42 Pa.C.S. § 8301-02 ("Wrongful Death Act") should be dismissed because such a claim does not constitute an independent cause of action. While technically correct, at this stage in this case, the Court declines to elevate form over substance and will construe the Complaint as requesting damages under the Wrongful Death Act. *See. e.g.. Villela v. City of Phila.*, No. 95-1313, 1995 WL 295318, at * 5 (E.D. Pa. May 1995) (treating plaintiff's separate claim for punitive damages as a request for punitive damages available under prior counts).  The Defendants have not argued in their Motion that Plaintiffs are not entitled to damages under the Wrongful Death Act, though they have alleged in a Motion in Limine that the Plaintiffs are not proper beneficiaries. (ECF No. 72).  Therefore, the Court will address this issue on Defendants' Motion in Limine.

[3]     The Court adopts the pagination supplied by the CM/ECF docketing system.

emergency Protection From Abuse ("PFA") orders and called police to have Singletary evicted from his residence pursuant to the PFA.  (*Id.*)

Under Pennsylvania law, an individual can secure an emergency PFA through an *ex parte* proceeding with a magisterial judge or through a master, with its issuance subject to a subsequent hearing in the Court of Common Pleas.  23 Pa.C.S. § 6107(b); 231 Pa. Code § 1901 (explanatory comment).  Within ten business days of such a filing, a hearing is held before a court, at which time the plaintiff must prove the allegations of abuse by a preponderance of the evidence.  23 Pa.C.S. § 6107.  A defendant is not required to respond to the allegations in an emergency PFA, and unless admitted, the allegations are deemed denied even without the defendant's response. 231 Pa. Code § 1901.6.  Violation of a PFA may result in indirect criminal or civil contempt.  23 Pa. C.S. §§ 6113, 6114.

On May 11, 2017, Clozie obtained an emergency PFA against Singletary, which was served on him on by Officers Schutte and Lorandeau on May 12, 2017 at around 1:23 a.m. (ECF No. 50-1 ¶ 4; ECF No. 55 ¶ 4; ECF No. 50-2.)[4]  When they served the PFA, Officers Schutte and Lorandeau directed Singletary to leave his residence, told him that he could no longer be at the property, and advised him that if he remained or came back, he would be arrested for violating the PFA.  (ECF No. 50-1 ¶ 9; ECF No. 55 ¶ 9.)  Prior to May 11, 2017, Clozie had obtained two prior PFAs, one of which was served approximately a month before Singletary's death.[5]  (ECF 53-2 at 4.)  When the officers served the PFA on May 12, 2017, Singletary, who was intoxicated, became angry, explaining to the officers that a judge threw the

---

[4]      A hearing as to the *ex parte* emergency PFA was to be held on May 16, 2017. (ECF No 50-2 at 2.)

[5]      Defendants' Statement of Undisputed Facts refers to two prior incidents, but Defendants have not attached exhibits nor is there anything in the record regarding two prior PFAs.

prior PFA out, that this was his house and Clozie did not live there.  (ECF No. 50-4 at 15; ECF No. 53-2 at 12-13, 19.)  Although initially angry, Singletary left the premises in tears shortly thereafter.  (*Id.*)  Officer Navedo testified that he told Officer Schutte "that Mr. Singletary is never going to learn. . .if you keep dealing with this woman . . . she's going to keep getting protection orders."  (ECF No. 53-2 at 13-14.)

In the early hours of May 12, 2017, Officer Schutte received a police radio call that Singletary had returned to his residence.  (ECF No. 50-4 at 17.)   Officer Schutte returned to the property to arrest Singletary for violating the PFA.  (*Id.*)  When Officer Schutte arrived, he spoke to Clozie who was outside the property and away from Singletary.  (*Id.*)  Singletary yelled down from a window that Officer Schutte would "have to call SWAT and all the cops . . . because he's not going without a fight."  (*Id.*)  Clozie told Officer Schutte that she had gone to a store, and while she was out, she locked herself out and that Singletary had returned to let himself back in. (ECF No. 50-4 at 17; ECF No. 53-5 at 2.)  Clozie then told Officer Schutte that Singletary had knives in the room with him, and Officer Schutte testified that he was concerned that Singletary might try stab him if he tried to arrest him. (*Id.*).  At that point, Officer Schutte called for additional backup.  (ECF No. 50-4 at 17.)

Officers Navedo, Gresham and Schaeffer heard the radio call and headed to the property. (ECF No. 50-1 at 3; ECF No. 50-5 at 7; ECF No. 50-6 at 5.)  Officer Lorandeau also was called back to the property, and when he arrived, he went to the rear and observed the windows and entrances to guard against Singletary fleeing.  (ECF  50-6 at 5.)   Eventually, Officer Sarith Tohn joined Officer Lorandeau at the rear of the property.  (ECF 53-3 at 13-14; ECF No. 53-2 at 18.)

 When Officer Navedo arrived, Clozie and Officer Schutte were talking outside the front of the property, and Officer Navedo knocked on the front door.  (ECF No.  53-5 at 3; ECF No.

50-5 at 8.)  A female opened the door and let Officers Schutte and Navedo into the common

space of the boarding house.  (*Id.*)  Officers Schutte and Navedo proceeded into the living room

and up five stairs to the landing of the stairway to the second floor.  (No. 53-3 at 13-16, 17-18.)

As Officers Schutte and Navedo ascended the stairs they saw Singletary enter a bedroom with a

knife.  (ECF No. 50-5 at 21.)

When Officers Gresham and Schaeffer arrived, they saw Clozie and another female

outside the house.  (ECF 50-6 at 5-7.)  They went inside the house, and Officer Gresham "didn't

see any movement but I heard commotion upstairs."  (*Id.*)  She did not see the other officers, and

Clozie informed Officer Gresham that they were already upstairs.  (*Id.*)  Although Officer

Gresham could hear banging, she did not hear any screaming, did not hear anyone make any

threats, and did not recall hearing the officers upstairs say anything.  (*Id.*)  Officer Schaeffer

went up the stairs before Officer Gresham.  (*Id.* at 8.)  Officer Gresham looked around, also went

upstairs, and never drew her gun or taser because according to her there "was no need for me to

draw my gun."  (*Id.*)  Officer Schaeffer also did not draw his gun or taser.  (*Id.*)

Like Officer Schutte, the other Defendant Officers were made aware that Singletary was

probably armed with a knife and "would fight the police."  (ECF No. 50-5 at 10; Comp. ¶ 33;

ECF 50-6 at 6.)  Despite this awareness, no one regarded the situation as a possible "barricade"

pursuant to Philadelphia Police Policy Directive 10.7.  (ECF No. 50-4 at 8; ECF No. 50-6 at 18;

ECF No. 53-3 at 9.)  According to Officer Michael Young, a Philadelphia Police Department

Lieutenant assigned to the Internal Affairs Division, once the Defendant Officers received

information from Clozie that Singletary had knives and heard Singletary yelling out the window

refusing to leave, the Defendant Officers should have designated the situation a "barricade."

(ECF No.  53-3 at 10.)  The failure to properly designate the incident as a "barricade" and await

the arrival of a patrol supervisor was a violation of Directive 10.7.  (*Id.*)  The Defendant Officers

were supposed to await the arrival of Sergeant Marvin Ruley before taking further action, and

Officer Young was surprised that they failed to do so. (ECF No. 53-3 at 11.)

The purpose of Directive 10.7 is "to help identify a 'barricaded person,' hostage taker, or

Severely Mentally Disabled Person (SMDP) and instruct police personnel in the proper tactics

and procedures in order to remove such an individual and safeguard the personal well-being of

all concerned."  (Compl. ¶ 19; Ex. A to Pl.'s Compl.)  A person who "has indicated by action or

implication that he/she may have a weapon and refuses to cooperate with police commands" is

generally considered a barricaded person for purposes of this policy.  (*Id.*)  Directive 10.7

provides that "[t]ime is of no importance in removing barricaded persons. . .unless there is

immediate danger to life." (*Id.*)  It further provides for the highest-ranking patrol supervisor or

Command Inspections Bureau (CIB) Commander to be in charge and specifies that "[n]o

aggressive action is to be taken by police personnel without the permission of the highest-

ranking patrol supervisor/commander or CIB commander on the scene (overall commander),

unless there is an immediate danger to life or exigent circumstances warrant such action. . .All

activities as well as the use of force will be under the control and direction of the overall

commander."  (*Id.*)  The policy mentions the need for the officers to maintain a "zone of

protection," reminds officers that "retreating or repositioning is not a sign of weakness or

cowardice" as "it is often a tactically superior police procedure rather than the immediate use of

force." (*Id.*)  It further instructs officers as to the importance of using caution, de-escalation, and

the need to wait for the arrival of a patrol superior before taking action barring a threat to life.

(*Id.*)  In particular, it specifically instructs officers to "[a]void placing themselves in a position

that requires taking unnecessary or overly aggressive actions."  (*Id.*)

Although the Defendant Officers would subsequently learn that the residence was a boarding house and there was at least one other resident in the home, at the time they arrived to arrest Singletary they were not aware of these facts.  (ECF No. 50-4 at 12, 116, 120; ECF No 50-6 at 37-38.)  Apparently, the officers were simply aware that Singletary's residence was a row-house among other row-homes. (*Id.*) The room itself in which Singletary was barricaded contained a single doorway to the hallway. (ECF No. 53-3 at 15.)

The Officer Defendants' testimony diverges as to what happened next once they reached Singletary's second-floor residence in the boarding house.  Officer Navedo testified that all the Defendant Officers agreed that Officer Schutte should kick in Singletary's door because there were multiple doors in the hallway and, consequently, the officers were concerned Singletary or another person could exit from one of these doors.  (ECF No. 50-5 at 11.)  Plaintiffs' dispute this version of events as a post-hoc justification for the use of deadly force.  The testimony of Officer Schutte, who fatally shot Singletary, supports Plaintiffs' account. Officer Schutte testified that when he got to the top of the stairs and before he kicked in the door, the Defendant Officers could have retreated down the stairs but that they "didn't think to do that. We were just there to arrest him." (ECF No. 50-4 at 33.)  Not only did Officer Schutte testify that his only objective in entering Singletary's room was to effectuate an arrest, he stated that he was almost certain that Singletary was confined to the bedroom in which he had barricaded himself. (ECF No. 50-4, at 32-33.)  Officer Schutte testified that there was no indication of any other exit or entrance other than the door they kicked in and the window.  (*Id.*)  He also stated that there was nothing about the building in particular to suggest that this row-house had interconnected rooms, although he could not be 100 percent sure because he could never be certain in any building.  (*Id.*)  Still, the Defendant Officers made no attempt before or after they entered the premises to communicate

with Clozie as to the layout or if there were any other residents, despite testimony from Officer Schutte that they had the ability to do so. (*Id.*) Officer Lorandeau also testified that he was not concerned about a potential ambush during any time he was within Singletary's home. (ECF No. 53-2, at 23.) Officer Young likewise testified that he did not think the Defendant Officers were unsafe in the hallway because Singletary was behind the door, the hallway itself was approximately fifteen feet to Singletary's door, and the stairway allowed egress from the building. (ECF No. 50-4, at 32-33.)

It is undisputed that at the time Officer Schutte kicked in the door to Singletary's room, he was not a danger to Clozie as she was outside the property. (ECF No. 50-5 at 13, 21; ECF No. 50-4 at 17.) Further, Officers Schutte and Navedo were aware that Singletary had a knife as they had seen him with one before he barricaded himself in the room. (*Id.*) There is nothing in the record to suggest that Singletary was a flight risk either; he simply did not want to come out of his room.

Whether the Officer Defendants attempted to talk to Singletary or knock and announce their presence before Officer Schutte kicked in the door is unclear. Officer Schutte testified that the Defendant Officers "yelled up that we were there and want to talk. And. . . [Singletary] started cursing and yelling. . .and he said if you want me you've got to kick the door in." (ECF No. 50-4 at 17.) Officer Navedo testified that the Defendant Officers did not knock, while Officer Gresham stated that Officer Schutte did, in fact, knock. (ECF No. 50-5 at 11; ECF No. 50-6, at 10.) Officer Navedo also testified that they did not try to talk to Singletary before breaking in the door and that if they did, he does not recall. (ECF No. 50-5 at 12.) Officer Gresham, in contrast, stated that Officer Schutte told Singletary to open the door, but Singletary "kept saying no, f*[] you and then we heard crashing. . .inside the bedroom." (ECF No. 50-6 at

10.)  Officer Gresham's testimony conflicts with the testimony of Officers Schutte and Navedo,
as she states that once Officer Schutte kicked in Singletary's door, they did not have their guns or
tasers drawn, whereas both Officers Schutte and Navedo testified that they did.  (ECF No. 50-6
at 10; ECF 50-4 at 17-18.)  Officer Lorandeau, who was outside the property, testified that he did
not hear any talking before a "loud boom or bang" noise, and subsequent taser zaps and
gunshots.  (ECF No. 53-2 at 18-19.)

The officers' testimony is also inconsistent regarding what occurred once Officer Schutte
kicked in Singletary's door.  Officer Navedo testified that when he entered the room, Singletary
was holding a kitchen knife with his right hand over the black handle, the knife tip facing the
ceiling, and his pinky finger at the bottom near his waist.  (ECF No. 50-5 at 16-17.)  According
to Officer Navedo, Singletary took a step toward Officer Navedo and in a "jabbing motion . . . he
brought his right arm back and thrusted it forward to attempt to stab" him.  (*Id.*) Officer Navedo
responded by taking a step back and tasing Singletary at center mass.  (*Id.*)  Officer Navedo
stated that Singletary grabbed at his chest where he was tased, but Navedo cannot recall if
Singletary's arms flailed, if he maintained stiff elbows, or if he made a thrusting motion as he
fell back.  (*Id.*)  Officer Navedo only recalled that when half Singletary's body hit the bed behind
him, in a "surreal" manner he "bounced right back up and still had the knife in his hand."  (*Id.*)
He then saw Singletary stand back up, swat the taser prongs away with the knife, heard him say
"that didn't do shit to me," and then lunge back at Officer Navedo in the same manner, at which
time Officer Schutte shot Singletary.  (*Id.*)

In comparison, Officer Schutte testified that once he kicked in the door, Singletary was
standing with a knife in his right hand by his head toward his shoulder with the blade pointing
outward, and he did not recall Singletary making a "blading" motion with the knife or lunging at

any officer, as Officer Navedo had testified.  (ECF No. 50-4, at 17-18, 42.)  His account was that

he told Singletary repeatedly to drop the knife, but Singletary refused, yelled, and cursed at the

Defendant Officers.  (*Id.*)  When Singletary did not drop the knife, Officer Navedo tased

Singletary which "knocked him back a little bit and he jumped right back up off the bed that I

knocked him on to."  (*Id.*)  Officer Schutte said that before he shot Singletary, he and Singletary

were moving their feet in a circular motion with Singletary directly in front of Officer Schutte.

(*Id*.)  Officer Schutte stated that it was only after Singletary was tased that he "proceeded to

move forward with the knife in an overhead motion."  (*Id*.)  Officer Schutte then shot Singletary

with his firearm, striking him twice in center mass.  (*Id*.) [6]

Officer Gresham testified that once Officer Schutte kicked in Singletary's door,

Singletary immediately came at the Defendant Officers into the hallway with a knife, which is

inconsistent with any other Defendant Officer testimony.  (ECF No. 50-6 at 11, 14.)  Officer

Gresham, similar to Officer Navedo, testified that once Singletary was tased, he bounced off the

bed and "demonically bounced back up" with the knife still in hand.  (ECF No. 50-6 at 14, 16.)

Officer Lorandeau, who is not a Defendant in this suit, offered testimony that could be

interpreted by a jury to conflict with the testimony of the Defendant Officers.  Although Officer

Lorandeau was outside the property at the time, he stated that he heard either "a bang or a boom

— then I could hear — I remember hearing something about hands, let me see your hands . . .

Then I remember hearing a zap, the sound of tasers, maybe two or three seconds, and then two to

three shots fired."  (ECF No. 53-2, at 18.)  He stated that the voice sounded like Officer Schutte.

---

[6]     In addition to recounting different sequences of events and Singletary's conduct, both
Officers Navedo and Schutte may offer conflicting statements as to where Singletary stood with
the knife and fell after Officer Schutte shot him though the parties did not attach the exhibits to
the depositions.  (ECF No. 50-5 at 19.)

(ECF No. 53-2, at 20.)   Officer Lorandeau does not recall hearing Singletary yell prior to the loud bang or boom. (ECF No. 53-2 at 18.)  He also stated that he did not hear any of the Defendant Officers' voices prior to the loud bang or boom which proceeded the taser zap and gunshot noises.  (*Id.*)  Thus, Officer Lorandeau's testimony was that a voice that sounded like Officer Schutte said "let me see your hands," not "drop your knife," after a loud bang or boom, that he heard no yelling or voices prior to that, and that he then heard taser zaps and two to three seconds later, gunshots.  Officers Gresham and Schaeffer remained in the hallway as all these events transpired.  (ECF No. 50-6 at 16.)

Officer Schutte testified that at the time of the incident, he did not know the procedure for calling a barricade under Directive 10.7.  (ECF No. 50-4 at 34.)  He was given a copy of Directive 10.7 but testified that he did not receive any specialized training beyond that as to this directive.  (*Id.*)  Officer Schutte, however, testified that he knew there was a specific number to call for a crisis negotiation coordinator, and that he had previously been involved in a situation where the barricade policy had been invoked a couple years prior to Singletary's death.  (*Id.* at 9, 34.)  He also testified that he was trained on "tunnel vision," a training that teaches officers not to be on autopilot by focusing too much on a target and forgetting the overall surroundings or context.  (*Id.* at 37.)

Officer Schutte was trained on the "killing zone" concept, which is the zone of danger in police work and teaches about avoiding this danger.  (*Id.*)  He was trained that when offenders do not comply, a police office should not move closer until adequate assistance arrives, and he was also trained on how to deal with domestic disputes, such as serving PFAs, which included ensuring separation of the parties and facilitating a place for one individual to stay elsewhere at night.  (*Id.* at 38, 43.)  Finally, he was trained in de-escalation techniques and crisis intervention.

(*Id.* at 43.)  After the incident with Singletary, Officer Schutte was reprimanded and told by supervisors that he should have called SWAT as it was a barricade situation.  (*Id.* at 37.)  Officer Schutte pled guilty to neglect of duty for failing to comply with a Police Commissioner order, directive, memorandum or any written or oral order of a superior.  (ECF 73 at 5.)

Officer Navedo, unlike Officer Schutte, testified that he received specialized training on the City's barricade policy and stated that at the police academy, all officers are trained on all directives.  (ECF No. 50-5 at 3.)  He also testified that since leaving the police academy he had received refreshers on the barricade policy and a physical copy of Directive 10.7.  (*Id.* at 3, 20.)  Officer Navedo testified that he had been involved in approximately six to ten barricades in his career prior to Singletary's death, and at least another one to two barricades since.  (*Id.* at 4.)  Similar to Officer Schutte, Officer Navedo was trained regarding the "killing zone" concept and about retreating to safe distances.  (*Id.* at 14.)  Officer Gresham was trained that if a suspect is yelling out the window of a home and refuses to comply with police officers, that she should notify and await the arrival of a supervisor.  (ECF No. 50-6 at 18.) Officer Gresham was familiar with Directive 10.7, the barricade policy, and had been involved in two prior barricades.  (*Id.* at 19.)

### B.  Procedural History

Plaintiffs commenced this action in the Philadelphia Court of Common Pleas by Writ of Summons on July 17, 2018, and filed a Complaint on January 8, 2019. (ECF No. 1.)  The Complaint sets forth seven counts:  (1) "Violation of 42 U.S.C. § 1983, Excessive Force – Defendant Officers"; (2) "Violations of 42 U.S.C. § 1983, Failure to Train" – City of Philadelphia; (3) "Violations of 42 U.S.C. § 1983, State-Created Danger" – All Defendants; (4) "Violations of 42 U.S.C. § 1983 (*Monell*), Unconstitutional Policy, Practice or Custom" – City

of Philadelphia, Commissioner Ross and Commissioner Ramsey; (5) "Violation of 42 U.S.C. §
1983, Excessive Force – Defendant Officer Schutte (6)"Assault and Battery" – Defendant
Officers; and (7) "Pennsylvania Wrongful Death and Survivor Act" – All Defendants.   On
January 14, 2019, Defendants removed the case to this Court.  (ECF No. 1.)

On January 30, 2019, Defendants filed their Answer and Affirmative Defenses to
Plaintiffs' Complaint.  (ECF No. 2.)  The Court granted Defendants' Motion to Amend/Correct
Defendants' Answer to Plaintiffs' Complaint on September 25, 2019 (ECF No. 26), and
Defendants' Amended Answer with Affirmative Defenses was docketed later that day.  (ECF
No. 27.)  On May 14, 2020, Defendants filed their Motion for Summary Judgment.  (ECF No.
50.)  Plaintiffs filed their Response in Opposition to the Motion for Summary Judgment on June
19, 2020 (ECF No. 53), and Response to Defendants' Statement of Undisputed Material Facts on
July 7, 2020 (ECF No. 55.)  On July 20, 2020, Defendants filed a Motion for Leave to File
Outside Time a reply brief to Plaintiffs' Opposition (ECF No. 57), which was granted on July 21,
2020 (ECF No. 58.)  On August 4, 2020, Plaintiffs filed a Surreply to Defendants' Reply in
Support of Their Motion for Summary Judgement. (ECF No. 62.)

## II.    LEGAL STANDARD

A court's role is not to evaluate the weight of the evidence, to judge the credibility of
witnesses, or to determine the truth of the matter, but instead to determine whether there is a
genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). To
determine whether any genuine issue of fact exists, the court must pierce the pleadings and
assess the proof as presented in depositions, answers to interrogatories, admissions, and
affidavits that are part of the record.  Fed. R. Civ. P. 56(c), Advisory Committee Notes, 1963
Amendments.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 255.

The movant bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). A factual dispute is "material" if it might well affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

A court must view the facts and draw all reasonable inferences in the non-moving party's favor. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004); *see also Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) ("In evaluating the evidence, we are required to view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion.") (internal quotation marks and citation omitted). Nonetheless, a court need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## II.  DISCUSSION

Plaintiffs argue that the Defendant Officers' escalation of force in violation of Philadelphia Police Policy Directive 10.7, violent confrontation of Singletary in his home and seizure was unreasonable because it made the shooting death of Singletary all but inevitable. Defendants' argue that Plaintiffs' excessive force claims cannot survive summary judgment because the shooting death of Singletary was objectively reasonable, and Singletary's use of a knife was a "superseding" event that broke the "chain of causation." As such, they argue that the Defendant Officers are entitled to qualified immunity as there is no underlying constitutional violation. In the alternative, they contend that even if the Defendant Officers' conduct amounted to excessive force, they are entitled to qualified immunity because the law did not clearly establish that they committed a constitutional violation.

As set forth below, with all reasonable inferences drawn in Plaintiffs' favor there is sufficient evidence to support Plaintiffs' claims against the Defendant Officers that their conduct amounted to excessive force and was the proximate cause of Singletary's death. Similarly, the disputed issues of material fact preclude summary judgment on qualified immunity and Plaintiffs' state law assault and battery claims. However, Plaintiffs fail to make sufficient allegations to support municipal liability under a failure to train theory or against Defendants under the "state-created danger" doctrine. Therefore, Defendants' Motion for Summary Judgment will be granted as to these claims.

### A.  Standard for Qualified Immunity

The doctrine of qualified immunity shields officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To

resolve a claim of qualified immunity, [we] engage in a two-pronged inquiry: (1) whether the

plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was

clearly established at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d

235, 241 (3d Cir. 2016) (internal quotation marks omitted).  We perform this inquiry "in the

order we deem most appropriate for the particular case before us." *Santini v. Fuentes*, 795 F.3d

410, 418 (3d Cir. 2015) (citing P*earson v. Callahan*, 555 U.S. 223, 236 (2009)).

### B.    Constitutional Violation - Excessive Use of Force

We first consider whether the Defendant Officers' conduct amounted to excessive force.

Excessive force claims are "properly analyzed under the Fourth Amendment's 'objective

reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989).  The operative

question in excessive force cases is "whether the totality of the circumstances justifie[s] a

particular sort of search or seizure." *Tennessee v. Garner*, 471 U. S. 1, 8 (1985).  We analyze

this question "from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to

make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—

about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-

97.  In assessing reasonableness, the court should balance the individual's interests against the

government's interests and pay careful attention to the facts and circumstances of the case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to

safety, and whether the suspect is resisting arrest or a flight risk. *Id.* at 396-97; *City of Los

Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Garner*, 471 U. S. at 8 (1985).

Even if the Defendant Officers' decision to kick in the door to Singletary's room was a

violation of state and federal law, Defendants argue that Singletary's subsequent actions in

allegedly lunging at the Defendant Officers with a knife, when he was previously confined to his

room and not a risk to Clozie, rendered their decision to use lethal force reasonable.  (ECF  No.

50 at 7-9.)  Plaintiffs counter that Defendants' argument is "unduly myopic" and legally

incorrect, in that it reframes the incident as a split-second interaction and requires this Court to

accept Defendants' version of events as true or as if it were a trier of fact without the proper

application of the totality of the circumstances test set forth in *Garner.*  (ECF No. 53-1, at 1-7.)

Therefore, we address to what extent the events leading up to Singletary's fatal shooting are

considered.

We note that there is no bright line rule that officers faced with violence in the final

segment of an incident may automatically respond with lethal force.  Such a rule would not only

run afoul of the totality of circumstances test in *Garner*, but it would immunize blatantly illegal

antecedent conduct which foreseeably resulted in the "need" to use force by inevitably leading to

a finding of no liability any time officers respond to an apparent threat to their safety.  Carried to

its logical conclusion, Defendants' position would immunize those who knowingly violate the

law or act intentionally with malice, by signaling that no matter how egregious, the use of force

is justifiable so long as, in the final "segment," the victim behaves in a manner that can be

interpreted as a threat. That has never been the law of this Court.

While an officer's use of lethal force to protect themselves is often considered objectively

reasonable, the inquiry does not end there.  *See, e.g. Lamont v. New Jersey*, 637 F. 3d 177, 183

(3d Cir. 2011) (upholding use of deadly force where officers uniformly testified that suspect who

appeared to be clutching an object "suddenly pulled his right hand out of his waistband" but

holding that there is a triable issue on whether the officers' continued use of force was

excessive); *Bodine v. Warwick*, 72 F. 3d 393, 400 (3d Cir. 1995) (providing a hypothetical that if

a suspect were to shoot at persons known to be officers, the suspect's act would absolve the officers of liability from unlawful entry).  In *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999) the Third Circuit Court of Appeals rejected the defendant's argument that there was no genuine issue of material fact and that the officer reasonably acted in self-defense, holding that the "totality of the circumstances" standard requires consideration of events preceding the seizure.  In that case, an officer working off-duty as a mall security guard shot and killed plaintiff's decedent while he was trying to flee after stealing clothes from a store.  *Id.* at 283.  The officer claimed that the decedent was a danger because he had attempted to run the officer over.  *Id.* at 291.  In rejecting contrary decisions from other circuit courts, the Court concluded that it was required to consider events prior to the actual shooting in assessing the reasonableness of the seizure.  The court reasoned:

> We do not see how these cases can reconcile the Supreme Court's rule requiring examination of the "totality of the circumstances" with a rigid rule that excludes all context and causes prior to the moment the seizure is finally accomplished. "Totality" is an encompassing word. It implies that reasonableness should be sensitive to all of the factors bearing on the officer's use of force.

*Id.* at 291.  The court noted that the consequence of these antecedent events, however, would be assessed based on "ordinary ideas of **causation**, not doctrine about when the seizure occurred." *Id.*  (emphasis added).

In a similar fashion, in the oft-cited case, *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), the Seventh Circuit Court of Appeals held that an officer, who jumped in front of a speeding stolen car and then used deadly force to stop the driver, was not entitled to qualified immunity despite the officer's argument that he acted in self-defense.  The court reasoned that a jury could find that the decedent's escape attempt did not present a threat to the officers until the officer stepped into the path of the car, and thus, the officer "unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him[.]" *Id.* at 232-233.  The court

noted that it was known that the decedent was attempting to escape in the face of police authority and that the underlying crime was not accomplished violently.  *Id.*  It was ultimately for the trier of fact to determine if the officer was in front of the car before it accelerated and if the decedent had an opportunity to stop, thereby making it reasonable for the officer to use deadly force.  *Id.* at 233.

Underlying these decisions is the principle that the totality of circumstances test requires consideration beyond the mere split second leading to the use of lethal force, and that the court is to use a proximate cause analysis.  The question then becomes how a court should assess proximate cause in an excessive force case?  The Supreme Court's decision in *City of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017) is instructive.  Despite rejecting the Ninth Circuit's "provocation rule,"[7] the Supreme Court remanded the case for a determination that applied a proximate cause approach to assess the defendants' liability.  In *Mendez*, the officers were briefed and advised that there was a couple residing in a shack in the rear of the property. Standard policy required officers to first obtain a warrant before entering the residence unless there were exigent circumstances.  *Id.* at 1544-46.  The officers failed to secure a warrant for the shack and entered the premises in violation of department policy, facilitating the need for the use

---

[7]     The now rejected Ninth Circuit "provocation rule" held that "an officer's otherwise reasonable (and lawful) defensive use of force is unreasonable as a matter of law, if (1) the officer intentionally or recklessly provoked a violent response, and (2) that provocation is an independent constitutional violation." *Id.* at 59. The Supreme Court rejected this rule because "it uses another constitutional violation to manufacture an excessive force claim where one would not otherwise exist." *Id.* at 1546.  The *Mendez* court also reasoned that this approach conflated distinct Fourth Amendment claims and that the objective reasonableness analysis must be conducted separately for each search or seizure.  *Id.* at 1547. The problem with the provocation rule was that it looked at whether there were independent constitutional violations rather than assessing under a proximate cause analysis whether the officers' conduct was a foreseeable and direct cause. The test was over-inclusive as an independent constitutional violation does not necessarily show that excessive force foreseeably caused the plaintiff's injuries.  It was also under-inclusive as there is conduct which, alone, is not an independent constitutional violation, yet can be the proximate cause.

of force. *Id.* It was established by the lower court that the act of shooting the respondent was reasonable under the Fourth Amendment, but respondents had argued that the officers were nonetheless liable because "police conduct prior to the use of force . . . reasonably created the need to use it." *Id.* at 1547 n.8.

The *Mendez* court, citing *Paroline v. United* States, 134 S. Ct. 1710, 1719 (2014), explained that a proximate cause analysis "required consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and required the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Mendez*, 137 S. Ct. at 1548-49.[8] On remand, the Ninth Circuit in *Mendez v. City of Los Angeles*, ("*Mendez II*") adopted this analysis and instructed the district court to amend its judgment "to award all damages arising from the shooting in the . . . plaintiff's favor as proximately caused by the unconstitutional entry, and proximately caused by the failure to get a warrant." 897 F. 3d 1067 (9th Cir. 2018). The defendants argued that the failure to get a warrant before entering the shack did not cause the plaintiff's injuries because, had the officers first gotten a warrant, the same sort of confrontation and shooting still could have occurred. *Id.* at 1074. The court noted that there was a duty not to enter a home without a warrant, consent, or exigent circumstances, and that the relevant consideration was "not what would have happened had the officers procured a warrant, but rather, what would have happened had the officers not unlawfully entered the residence." *Id.* at 1076. The court held that a reasonable officer would have considered the

---

[8]     In *Paroline*, 134 S. Ct. at 724 the Supreme Court noted that "it would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm. And it would be nonsensical to adopt a rule whereby individuals hurt by the combined wrongful acts of many (and thus in many instances hurt more badly than otherwise) would have no redress, whereas individuals hurt by the acts of one person alone would have a remedy. Those are the principles that underlie the various [aggregate] causation tests the victim and the Government cite, and they are sound principles."

shack a different residence and obtained a warrant for entry as it is foreseeable that a person in a

home could be armed and ready to defend himself against a perceived intruder and "unlawful

entry invites violence." *Id.* Thus, the court stated that "[t]his is not a case where one can say

that the injury to the . . . [plaintiff] was a mere fortuity. The injury followed in the normal course

as a result of the unlawful acts of the officers." *Id.* The Supreme Court denied defendants'

subsequent petition for writ of certiorari. *Los Angeles City Cal. v. Mendez*, 139 S. Ct. 1292

(2019).

These principles apply to the case at hand. The Court finds that the record reveals a

genuine dispute of material facts as to whether the Defendant Officers used excessive force. *See*

*Duvall v. Hustler*, 447 F. Supp. 3d 311, 328 (E.D. Pa. 2020) (existence of inconsistent officer

testimony made it impossible in a summary judgment posture for the court to determine as a

matter of law that the shooting was reasonable); *Sharrar v. Felsing*, 128 F.3d 810, 828 (3d Cir.

1997) (the existence of disputed, historical facts material to the objective reasonableness of an

officer's conduct will give rise to a jury issue); *see also Karnes v. Skrutski*, 62 F.3d 485, 499 (3d

Cir. 1995) (contradictory testimony created genuine issue of material fact). First, there are

sufficient issues of material fact as to whether the Defendant Officers' failure to conform to

established police policy and storm the door, when Singletary was neither a flight risk nor a risk

to others, was a proximate cause of Singletary's shooting. The conduct that precipitated the

seizure matters, not just as context for understanding the seizure as an isolated segment, but as

context for understanding the entire chain of events. Officers Schutte and Navedo entered

Singletary's room in a violent manner in contravention of police policy, and they did so simply

to effectuate an arrest for contempt of court when time was not of the essence, as Singletary was

neither a flight risk nor a risk to Clozie. The policy that the Defendant Officers violated reflected

the important social interests of minimizing interactions between armed police officers and

persons barricaded in their homes, precisely because such interactions can foreseeably lead to

tragic incidents in which people are injured or killed due to a split-second decision by officers

even for relatively minor crimes, like contempt of court.  In this case, and drawing all inferences

in favor of the Plaintiffs, a jury could find that the officers' foreseeably and unreasonably created

the need to use lethal force.  *See Stamps v. Town of Framingham*, 813 F. 3d 27, 32 n.4 (1st Cir.

2016) (police training and procedures "do not, of course, establish the constitutional standard but

may be relevant to the Fourth Amendment analysis."); *Drummond ex rel. Drummond v. City of

Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("Although . . . training materials are not

dispositive, we may certainly consider a police department's own guidelines when evaluating

whether a particular use of force is constitutionally reasonable."); *see also Johnson v. City of

Philadelphia,* 837 F.3d 343, 351 (3d Cir. 2016) ("We do not automatically discount Plaintiff's

Fourth Amendment argument" or the "presumption on which it rests: that official police

department policies may be considered among other things in the reasonableness inquiry.")

The Defendant Officers also offer conflicting reports as to what warning was given to

Singletary before force was applied, and whether Singletary was actively resisting before and

after he was tased and shot.  According to the Defendants, fearing for the Defendant Officers'

safety and unable to retreat, Officer Schutte broke in Singletary's door, and Singletary

immediately "lunged" at Officer Navedo.  Even after Officer Navedo tased Singletary, Officer

Schutte stated that Singletary ignored repeated calls to drop the knife, and instead lunged at

Officer Schutte who then shot him in self-defense.  These facts, if found true, would compel the

conclusion that Defendant Officers acted with the reasonable belief that Singletary posed a

significant threat of death or injury.

Critically, however, the testimony contains numerous inconsistencies that this Court would have to ignore to find that Defendant Officers are entitled to qualified immunity on a motion for summary judgment.  Officer Lorandeau, who is not a defendant in this suit, testified that a voice that sounded like Officer Schutte said "let me see your hands," not "drop your knife."  (ECF No. 53-2, at 18-20.)  Officer Lorandeau also testified that he heard taser zaps and two to three seconds later, gunshots, which may conflict with the testimony of Officer Schutte that there was a period of circling between Officer Schutte and Singletary before he was shot.  Both Officers Gresham and Navedo recount an equally dramatic, but inconsistent version of events.  In particular, they testified that all within mere seconds, Singletary charged at Officer Navedo with a knife; Officer Navedo tased Singletary, who fell back onto the bed behind him; and Singletary immediately bounced back up "demonically" in a "surreal" manner while simultaneously swatting off embedded taser barbs and lunging at Officer Schutte with a knife in hand.  (ECF No. 50-6, at 16.)

Several inconsistencies among the officers also exist regarding whether Singletary lunged at any Defendant Officer once Officer Schutte kicked in his door, and if he made threats or simply refused to come out of his room.  Officers Lorandeau and Gresham did not hear Singletary make threats before being tased and shot, whereas Officers Schutte and Navedo testified that Singletary did.  Officer Schutte testified that Singletary did not lunge at any officer after Officer Schutte kicked in the door.  According to Schutte, it was only after Singletary was tased that he jumped back up and proceeded to move forward with the knife in an overhead motion; however, Officer Navedo stated that Singletary immediately lunged forward once his door was kicked in.  In contrast, Officer Gresham testified that once Officer Schutte kicked in the door, Singletary came into the hallway with a knife in hand, which is inconsistent with the

accounts of other Defendant Officers,' none of whom testified to this version of events.  Officers

Schutte and Navedo further offer conflicting accounts as to where Singletary was holding a knife

in relation to his body and the direction the knife was pointing.[9]  Although Officer Lorandeau

was outside when Singletary was shot, his testimony combined with the inconsistent Defendant

Officer testimony could cast doubt on whether Officer Schutte reasonably acted in self-defense

and whether Singletary was or was not holding a knife or lunging at the any Defendant Officers

at the time he was shot and/or tased.

These material facts are important to determining whether there was a threat to the

Defendant Officers' safety, and whether Singletary was resisting commands.  On summary

judgment, we must approach the officers' account as to what happened inside Singletary's

bedroom with caution.  As numerous courts have noted, since the victim of deadly force is

unable to testify, courts should be cautious on summary judgment to "ensure that the officer is

not taking advantage of the fact that the witness most likely to contradict his story – the person

shot dead – is unable to testify.  *See Abraham*, 183 F.3d at 279; *see also Hinson v. Bias*, 927 F.3d

1103, 1118 (11th Cir. 2019) ("we cannot credit an officer's version of events just because a

plaintiff cannot personally rebut it"); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)

("particular care" required before summary judgment can be granted "where the officer

defendant is the only witness left alive to testify"); *Scott v. Henrich*, 39 F. 3d 912, 915 (9th Cir.

1994); *Lamont,* 637 F.3d at 181–82.

The markedly different testimony also calls into question whether the Defendant Officers

may have coordinated or fabricated their accounts.  While it is not this Court's role to determine

---

[9]      The parties have not included the exhibits to the deposition, but it also appears there may be
inconsistent testimony between Officers Schutte and Navedo as to where Singletary stood in the room.

what occurred in those pivotal moments on a motion for summary judgment, it is important to discuss how the inconsistent testimony is material to the application of law. Specifically, given numerous inconsistencies, a jury could reasonably wonder whether Singletary was tased simply for holding a knife after the Defendant Officers, without warning, violently broke in his door. They could also reasonably wonder whether Officer Schutte shot Singletary after Singletary lunged at him with a knife in hand, or if Singletary simply bounced back off the bed from being tased, and the Defendant Officers could not see his hands which led Officer Schutte to shoot him. Even assuming Singletary lunged at Officer Navedo when Officer Schutte broke down the door, a jury could find, in light of the Defendant Officers' inconsistent testimony, that Officer Schutte did not fire until it was no longer objectively reasonable for him to believe he was in peril. *See, e.g., Abraham*, 183 F. 3d at 294 ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis v. Wynalda,* 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

Further, if Singletary simply had a knife in hand, then the Third Circuit Court of Appeal's decision in *Kelley v. O'Malley*, 787 Fed. Appx. 102 (3ʳᵈ Cir. 2019) would assist the analysis. In *O'Malley*, police officers approached and accused two men of violating open container laws. *Id.* While walking away, one of the men, who was homeless, pulled out a knife to protect himself. *Id.* Fourteen police officers, along with a dog, surrounded him, threatening that they would release the dog on him if he did not drop the knife. *Id.* at 104. When the man did not drop the knife, the police released the dog and the man stabbed the dog. *Id.* In finding that the district court erred in dismissing the excessive force claim, the Third Circuit noted that while it was true that the man refused to drop his knife and stabbed the dog, the man was cornered and incapable

of fleeing, the knife use was in response to the dog attack, and there was a sizeable use of force in relation to the relatively minor nature of crime that heightened tensions. *Id.* The court concluded that "[a] jury could properly say, on these facts, that it was not at all reasonable for officers to shoot someone who they have corned and set an attack dog on, when that person poses little threat to anyone, is vastly outnumbered by armed officers, and is only defensively wielding a knife." *Id.* at 106. Like the decedent in *O'Malley*, a jury could find that Singletary was cornered and outnumbered by the four officers in his residence and the two officers outside. He was in his home, and when the officers went to arrest him in the middle of the night by kicking in his door, that only escalated the situation, particularly given that they did not attempt to follow Directive 10.7. If Singletary was only wielding a knife, a jury could find the Defendant Officers' use of force excessive.

Because the Defendant Officers offer conflicting testimony as to what occurred once Office Schutte kicked in Singletary's door, we cannot say as a matter of law that the Defendant Officers' conduct was objectively reasonable. Nor can we say as a matter of law that Singletary's actions constitute a superseding event. In *Johnson v. City of Philadelphia*, the Third Circuit held that even if the police officers acted unreasonably in their initial approach, the causal link had been broken when the decedent's "sudden, unexpected attack" and attempt to grab the officer's gun out of its holster "forced the officer into a defensive fight for his life." 837 F. 3d 343, 352 (3d Cir. 2016). However, the *Johnson* court specifically stated that "we sound a note of caution" citing the "extreme" facts of the case and indicated that "[i]f a plaintiff produces competent evidence that persons who have certain illnesses or who are under the influence of certain substances are likely to respond to particular police actions in a particular way, that may be sufficient to create a jury issue on causation." *Id.* at 353-353. The *Johnson* court also noted

that proximate cause issues are normally ones for a jury unless there is no evidence from which a jury could reasonably find proximate cause. *Id.* at 352. Unlike in this matter, each of the three officers in *Johnson* consistently testified that the decedent attempted to grab the gun of the officer who shot him, while, here, the Defendant Officers offer conflicting testimony as to what occurred in the final moments before Singletary was shot and killed. *Id.* at 350. In addition, the Defendant Officers had information that Singletary was armed and refused to come out, they knew he had a knife when Officer Schutte kicked in the door, and Singletary was visibly intoxicated. Yet the Defendant Officers chose to initiate the one-on-one conflict with Singletary in violation of Directive 10.7 even though Singletary was confined to his room and posed no threat to other citizens. All of these facts made it highly foreseeable that a violent altercation would ensue. In contrast, the decedent in *Johnson* was outside, not safely confined in a room, and the officers had no reason to foresee that he would attempt to grab an officer's gun.

Officers have a duty to act in a manner consistent with police policies and the law, and when their violation results in the precise conduct that a policy is meant to prevent, the outcome cannot be said to be totally independent and unforeseeable. In tort law, the intervening cause doctrine operates to relieve an actor from liability when a new, independent and unforeseen cause intervenes to produce a result that the negligent actor could not have reasonably foreseen. *See, e.g. Bouriez v. Carnegie Mellon Univ.*, 585 F. 3d 765, 773 (3d Cir. 2009) (discussing "superseding cause" under Pennsylvania law); *Chacko v. Commonwealth Dep't of Transp.*, 611 A.2d 1346, 1349 (Pa. Commw. Ct. 1992) (A "superseding cause" is an intervening force that is "so extraordinary as to not have been reasonably foreseeable"); *see also Exxon Co. v. Sofec*, 517 U.S. 830, 837 (1996) (discussing superseding causes in admiralty law). But not all intervening events constitute "superseding" causes to relieve the actor of liability.

There is no requirement that a cause, to be regarded as the proximate cause, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result. *See Bouriez*, 585 F. 3d at 773 (Noting that it is well established that a "substantial factor need not be the only factor" in bringing about the relevant harm); Restatement (Second) of Torts §§ 432, 433, 440. An intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct was a substantial factor in bringing about the harm. *Exxon Co.*, 517 U.S. at 837 (noting that an intervening cause is only superseding if it is "a later cause of independent origin that was not foreseeable."); Restatement (Second) of Torts § 443 (noting that only an act that is abnormal or extraordinary in retrospect serves as a superseding cause).

Indeed, even criminal acts by third parties may not be a superseding cause. *See* Restatement (Second) of Torts § 448 ("The act of a third person in committing an intentional tort or crime is a superseding cause…unless the actor at the time of his negligent conduct should have realized the likelihood that such a situation might be created[.]"); *Powell v. Drumheller*, 653 A.2d 619, 624 (Pa. 1995) (holding that criminal conduct does not act as a *per se* superseding force); *Straw v. Fair*, 187 A.3d 966, 995 (Pa. Super. Ct. 2018) (intoxicated driver hitting the plaintiff did not relieve the defendants of liability from their negligence in performing services on plaintiff's latch hood to their car). And if the actor's unlawful conduct "threatens harm to another's person, land or chattels, the normal efforts of the other or a third person to avert the threatening harm are not a superseding cause of harm resulting from such efforts." Restatement (Second) of Torts § 445.

A jury could conclude that the Defendant Officers' acts triggered a rapid exchange of escalating reactions and counter-reactions, all of which were directly foreseeable to the Defendant Officers at the time they stormed Singletary's residence to arrest him, and which they had reason to believe would lead to, and would be a substantial factor in their need to deploy lethal force.  A jury could determine that Defendant Officers' decision to storm the room was not only unjustified, as Singletary's noncompliance did not warrant this level of force given that he did not present a threat to officer safety or to Clozie, but also ineffective, as their use of force could actually be said to increase his resistance and escalate the situation.  It was known that Singletary had a knife and had stated that he would not comply without a SWAT team, and even the Defendant Officers admitted that they believed Singletary was intoxicated and would use a knife if they tried to enter his room to arrest him. Thus, a jury could conclude that the tragic outcome was directly foreseeable.

Defendants' citation to cases involving haste and rapidly evolving events are not on point because there are significant factual disputes as to whether there were exigencies requiring immediate action.  Unlike *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015), there was no concern that Singletary would escape through the window of his room.[10]  Genuine issues of material fact also exist regarding whether the Defendant Officers tased and shot Singletary when he was not lunging at them with a knife and was no longer a threat.  It is undisputed that Clozie was safe and not near Singletary at the time the Defendant Officers entered Singletary's home.  The Defendants, however, argue that once the Defendant Officers got to the top of the stairs, they were unsure of the layout of the rooms, there were multiple

---

[10]     Further, in *Sheehan*, the Court did not answer whether the use of force in that case was excessive, but only if there was clearly established law as to what the Constitution required. *Id*.at 1778 ("[W]e need not decide whether the Constitution was violated…").

locked doors, and, fearing for their safety, they decided to face Singletary head-on by kicking in his door. But again, the Defendant Officers offer conflicting testimony on this point. Officer Gresham testified that she and Officer Schaeffer did not have their weapons drawn at any point when in the hallway of the house because there "was no need for me to draw my gun" and "there were two officers in front of us. So whatever weapons we would have had they would have got it." (ECF No. 50-6, at 8.) She later tried to correct herself by saying it would be unsafe to draw her weapon and unsafe to retreat. (*Id.* at 12.) Officer Schutte testified that he was almost certain that Singletary was contained within the bedroom in which he had barricaded himself, and that his only objective in entering Singletary's room was to effectuate an arrest. Before he kicked in the door, Officer Schutte stated that the Officer Defendants could have retreated down the stairs but that they "didn't think to do that. We were just there to arrest him." (ECF No. 50-4, at 33.) Officer Lorandeau also testified that he was not concerned about being ambushed during any time while he was within Singletary's home. (ECF No. 53-2, at 23.) The room itself contained a single doorway to the hallway, and Officer Young testified that he did not think the Defendant Officers were unsafe in the hallway because Singletary was behind the door, the hallway itself was approximately fifteen feet to Singletary's door, and the stairway allowed egress from the building.

Further, the Defendants, in essence, ask this Court in a summary judgment motion, to view this deadly force case from the subjective perspective of the Defendant Officers involved in the incident—assessing the facts in relation to what they suggest the officers were thinking or feeling, instead of asking, as case law requires, whether a jury could find that a reasonable officer would not have used deadly force. The record contains nothing to establish that this particular house had unique characteristics whereby an occupant of one room could pop in and

out of another room, such that it was objectively reasonable to fear for one's safety by the mere fact that there were multiple doors on the second floor of a row house.  Similarly, there is no evidence regarding an apparent risk at the bottom of the stairs.

Defendants state that refusing to accept the version of events in their briefing constitutes "armchair criticism" and "Monday-morning quarterbacking," but substituting the Court's role for that of the jury would do precisely that.  Here, the reasonableness of the Defendant Officers' actions requires weighing the credibility of testimony, the layout of the property, and other evidence.  Only a jury can appreciate the tenor and demeanor of a witness, and a jury could very well find, based on testimony or common sense, that the Defendant Officers' testimony is not credible, and perhaps implausible, or to the contrary, they could believe the Defendant Officers' version of events.  *See, generally, Tolan v. Cotton,* 572 U.S. 650 (2014) (since qualified immunity cases illustrate the importance of drawing inferences in favor of the non-movant, the lower court should have acknowledged and credited Tolan's evidence with regard to lighting, demeanor, words spoken, and positioning rather than simply accepting the officer's account); *Waters v. Delaware,* No. 18-cv-266, 2020 U.S. Dist. LEXIS 139570 (Del. D. Aug. 5, 2020) (where testimony and taser report conflicted, there were genuine issues of material fact as to whether the third taser burst constituted excessive force).  It is not the function of this Court to usurp the role of a jury. Inconsistent, self-serving testimony where the only person capable of disputing it is deceased does not support a finding that there is no genuine issue of material fact for the jury.  *See Duvall v. Hustler*, 447 F. Supp. 3d 311, 325 (E.D. Pa. 2020) (officer credibility was called into account where there were unexplained discrepancies, and implausibility that they saw the decedent both fire a gun and at that same time acknowledged he did not have a gun that "calls into question whether the officers have shaded their testimony to avoid the appearance that

they had an opportunity to get their stories straight"); *also U.S. v. Grant*, 412 F. Supp. 2d. 451, 452 (E.D. Pa. 2005) (granting defendant's motion to suppress evidence during a search of a vehicle finding that because of a number of contradictions and implausibility's of the officers' testimony that defy credibility, showed that a traffic violation was fabricated to justify a stop and search of a car).  The task of weighing the evidence, reconciling conflicts, and determining the credibility of testimony is the sole province of the jury.  In light of the record thus far, we cannot say as a matter of law that the Defendant Officers' use of force was objectively reasonable.  Accordingly, the Court finds that there are material issues of fact sufficient to go to a jury as to whether the Defendant Officers used excessive force.

### B.      Clearly Established Constitutional Right

We now turn to whether it was clearly established that the Defendant Officers' conduct was unlawful.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The Supreme Court "ha[s] repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Rather, the "right's contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).  However, a right may be "clearly established" even without a "'precise factual correspondence' between the case at issue and a previous case." *Peroza-Benitez v. Smith,* 994 F. 3d 157, 165 (3d Cir. 2021) (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F. 2d 139, 144-45 (3d Cir. 1984.  After all, if courts refuse to allow constitutional claims to proceed because there is not an exact case that fits every aspect of the fact pattern of the case before it,

the law would never become clearly established, allowing officials to commit precisely the same misconduct indefinitely, free of accountability.

The Third Circuit has previously noted that the imperative to decide qualified immunity issues early in the litigation can conflict with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right.   *See, e.g., Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir.1996). Thus, a decision on qualified immunity will be premature when there are unresolved disputes of material fact relevant to the immunity analysis.   *Giles v. Kearney*, 571 F. 3d 318, 326 (3d Cir. 2009) (although question of qualified immunity is generally a question of law, "a genuine issue of material fact will preclude summary judgment on qualified immunity"); *Curley v. Klem*, 298 F. 3d 271, 278 (3d Cir. 2002) (noting that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."); *see, e.g. Noble v. City of Camden*, 112 F. Supp. 3d 208, 228 (D.N.J. 2015) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts, the officer beat the restrained, unarmed plaintiff, including after he fell on the ground); *Geist v. Ammary,* 40 F. Supp. 3d 467, 485-86 (E.D. Pa. 2014) (denying immunity on excessive force claim because of unresolved factual disputes as to the reasonableness of the officer's use of a taser); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts, the officer pushed a compliant prisoner to the ground without provocation from her, and knowing the others present posed no threat); *Jackson v. City of Pittsburgh*, 688 F. Supp. 2d 379, 401 (W.D. Pa. 2010) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts,

officers used force against the unarmed plaintiff who did not exert any threats toward the officers).

The Defendant Officers here offer markedly different accounts of what happened during the pivotal seconds before Singletary's death.  While there are factual disputes that need to be resolved before determining if the Defendant Officers conduct violated clearly established law, the Court notes that there is clearly established law and a robust consensus of cases supporting the proposition that the decision to storm Singletary's room when he was a danger to no one and not a flight risk, and subsequent decision to fatally shoot him, if he was no longer a threat from being subdued by a taser, constitutes an unreasonable use of force.  *See, e.g. Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is justified in issuing force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished") (citation omitted); *Anthony v. Seltzer*, 696 F. App'x 79, 82-83 (3d Cir. 2017) (noting the existence of pre-2013 precedent in support of the "long established Fourth Amendment law, [that] force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others . . . even if he was initially non-compliant" and holding that "continued application of force to an unthreatening and subdued individual suffering a seizure constituted unreasonable use of force under the Fourth Amendment"); *Shultz v. Carlisle Police Dep't*, 706 F. Supp. 2d 613, 624 (M.D. Pa. 2010) (denying summary judgment on qualified immunity grounds where officers "repeatedly tas[ed] a subject who had already been subdued and did not pose any threat"); *Brown v. Burghart,* No. 10-3374, 2012 U.S. Dist. LEXIS 73543 (E.D. Pa. May 25, 2012) (holding that police officer was not entitled to qualified immunity where the officer violated his training by deploying a taser near gasoline, the individual harmed was resisting arrest, but unarmed, was not attempting to harm

officers, and aside from resisting arrest, only committed a traffic violation); *Simmons v. Hinton*, No. 13-cv-2566, 2015 WL 1041583, at *4, *6 (D. Colo., March 5, 2015) (denying summary judgment because "a reasonable officer would not have reason to believe that a person who had already been tased once and was lying motionless . . . posed an immediate threat to officer safety").  *Morais v. City of Phila.,* No. 06-582, 2007 WL 853811, at *5 (E.D. Pa. Mar. 19, 2007 (while the law was not clearly established as of 2007, the Court held that the decision to storm decedents apartment he was barricaded in was an unreasonable use of force, when he was only armed with a knife and confined within his room); *Wilson v. Borough of Bellmar*, No. 13-cv-5437, 2016 WL 7377114, at *13 (D.N.J. Dec. 20, 2016).

The Court is mindful of the difficulties facing police officers who are often required to make split-second decisions about the necessity of force.  This case, however, goes beyond a mere dispute as the reasonableness of force; it involves officers who knowingly violated police policy where there are significant factual inconsistencies that call into question the application of force and whether the Defendant Officers were acting in self-defense. Therefore, until these material issues of fact are resolved by a jury we cannot say as a matter of law that the Defendant Officers are entitled to qualified immunity.

### C.    *Monell* Liability

The liability of a municipality under 42 U.S.C. § 1983 is governed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Under *Monell*, a municipal entity may be liable under 42 U.S.C. § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights."  *Id*. at 694; *see also Reitz v. Cty. of Bucks*, 125 F.3d 139, 144 (3d Cir. 1997).  Plaintiffs do not oppose the dismissal of their *Monell* claims under a policy,

practice or custom theory and against Commissioners Ross and Ramsey.   (ECF No. 53-1, at 17).

Instead, Plaintiffs premise *Monell* liability on a failure to train theory, challenging the sufficiency

of the City of Philadelphia's training on its barricade policy as set forth in Directive 10.7.

Plaintiff's failure to train *Monell* claim fails as a matter of law. A municipality may be

liable under Section 1983 for failing to train its employees "when the failure to train

demonstrates deliberate indifference to the constitutional rights of those whom the [employees]

may come into contact[.]"  *Gilles v. Davis*, 427 F. 3d 197, 207 n. 7 (3d Cir. 2005).  "[T]here are

limited circumstances in which an allegation of failure to train can be the basis for liability under

§ 1983."  *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  A district court must look to (1)

whether the training program is adequate and (2) whether any inadequate training "can

justifiably be said to represent city policy."  *Id.* at 390 (internal quotations omitted).  In other

words, a municipality will only be liable for inadequate training if, "in light of the duties

assigned to specific officers or employees the need for more or different training is so obvious,

and the inadequacy so likely to result in the violation of constitutional rights, that the

policymakers of the city can reasonably be said to have been deliberately indifferent to the

need."  *Id.*  "Courts should be careful not to impose liability merely because municipal training

*could* have been more thorough or comprehensive – that question will almost always be

answered in the affirmative.  Rather the question is whether the training *should* have been more

thorough or comprehensive, an inquiry that focuses on the deliberate indifference standard."  *Id*

at 392.

A plaintiff may *not* establish a failure to train claim by:  "presenting evidence of

shortcomings of an individual; (2) proving that an otherwise sound training program occasionally

was negligently administered; and (3) showing, without more, that better training would have

enabled the officer to avoid the injury causing conduct." *Simmons v. City of Phila.*, 947 F.2d 1042, 1060 (3d Cir 1991). A lack of adequate training is demonstrated by "a pattern of tortious conduct . . . rather than [by] one-time negligent administration of the program or factors peculiar to the officer involved in the particular incident." *Bd. of Cnty. Comm'rs v.* Brown, 520 U.S. 397, 407-408 (1997).

This is a case about the failure of the Defendant Officers to follow the policies that the City of Philadelphia had in place, not the City's failure to have a policy. It is undisputed that the City had a barricade policy, Direction 10.7, to guide its officers' behavior in the exact situation that was encountered here. Officer Schutte was trained on the "killing zone" concept, he was trained that when offenders do not comply, he should not move closer until adequate assistance arrives, and he was also trained on how to deal with domestic disputes, which included separating parties and facilitating a place for one individual to stay elsewhere at night. While he testified that he only received a handout on Directive 10.7, he was trained on de-escalation techniques and crisis intervention, and he knew that there was a crisis negotiator number to call. Officer Navedo, unlike Officer Schutte, testified that he received specialized training on the City of Philadelphia's barricade policy and stated that at the police academy officers are trained on all directives. He also received refreshers on the barricade policy and received a physical copy of Directive 10.7. Similar to Officer Schutte, Officer Navedo was trained regarding the "killing zone" concept and about retreating to safe distances.

Most critically, all the Defendant Officers, including Officer Schutte, were previously involved in incidents where the barricade policy was instituted. Defendant Navedo testified that he was involved in "six to ten" barricades; Defendant Schutte was involved in one barricade; and Officer Gresham was involved in two barricades. Thus, the Defendant Officers were actually

aware of the policy, had been involved in situations designated as a barricade pursuant to this policy, yet apparently disregarded it during the incident with Singletary.

Ultimately, Plaintiffs have not satisfied their burden that a failure to train the Defendant Officers amounted to "deliberate indifference" or that better training would have avoided the injury. Therefore, the Court will grant summary judgement on Plaintiffs' *Monell* claims.

### D.    Assault and Battery Claims under Pennsylvania Law

Genuine issues of material fact preclude summary judgment on Plaintiffs' state law assault and battery claims against the Defendant Officers. Under Pennsylvania law, an "[a]assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). Although "[a] police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty," he nevertheless "may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive." *Id*. "The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." *Id.*; *see also Boyden v. Twp. of Upper Darby*, 5 F. Supp. 3d 731, 744 (E.D. Pa. 2014).

The Pennsylvania Political Subdivision Tort Claims Act (the "Tort Claims Act") bars claims against municipal employees unless his or her conduct constitutes a "crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S. § 8550. Pennsylvania courts have defined "willful conduct" as that which either the actor desires to bring about or is aware that it is substantially certain to follow. *See Bright v. Westmoreland County*, 443 F. 3d 276, 287 (3d Cir. 2006) (quoting *Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239,

1252-53 (Pa. Cmwlth. 2002); *Evans v. Philadelphia Transportation Co.*, 212 A.2d 440 (1965). However, in the context of claims for assault and battery by a police officer, the relevant inquiry, instead, is the reasonableness of the force, which determines whether the police officers' conduct also constitutes assault and battery. *Renk*, 641 A.2d at 293. In other words, the inquiry is substantially similar to whether a Fourth Amendment excessive force violation has occurred.

The Court has already concluded that due to factual disputes, including the Defendant Officers' contradictory testimony, a jury could conclude that the Defendants Officers' conduct was objectively unreasonable. Thus, a jury could similarly find that the Defendant Officers' use of force was unreasonable, and therefore unprivileged in the tort context, and put Singletary in immediate apprehension of harmful contact. When Officer Schutte fired, two bullets struck Singletary, causing a harmful contact. It follows that there are genuine issues of material fact sufficient to go to the jury as to whether the Defendant Officers' conduct constituted assault and battery. Therefore, the Court will deny Defendants' Motion for Summary Judgment on Plaintiffs' assault and battery claims.

### E.  State-Created Danger

The Plaintiffs also argue that the Defendants violated Singletary's rights under the "state-created danger" doctrine. State actors generally do not have an affirmative duty to act to protect citizens from privately inflicted harms. *DeShaney v. Winnebago County Dep't of Soc. Serv.* 489 U.S. 189, 195-96 (1989). However, the state-created danger theory operates as an exception to the general rule that state actors have no affirmative duty to protect a citizen who is not in state custody. It imposes constitutional liability "when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention." *Schieber v. City of Philadelphia*, 320 F. 3d 409, 416-21

(3d Cir. 2003).  In order to prevail on a state-created danger claim, a plaintiff must prove: (1) the

harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful

disregard for the safety of the plaintiff; (3) there existed some relationship between the state and

the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise

would not have existed for the [harm] to occur.  *Mark v. Borough of Hatboro*, 51 F.3d 1137,

1152 (3d Cir. 1995).  In addition, the state actor must have "acted with a degree of culpability

that shocks the conscious" unless state actors have time to make unhurried judgments in which

case the level of culpability required is deliberate indifference.  *See Schieber v. City of*

*Philadelphia*, 320 F. 3d 409, 416-21 (3d Cir. 2003) (adding the "shocks the conscious" standard

in the aftermath of the *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) and holding that the

officers' failure to kick down the decedent's door and save her following a call from concerned

neighbors when she was being raped and murdered did not amount to "shocks the conscious");

*Sanford v. Stiles,* 456 F.3d 298, 309 (3d Cir. 2006); *see also Bright v. Westmoreland Count*y, 443

F.3d 276, 281 (3d Cir. 2006).

  First, the doctrine does not appear to be on point, as there is no allegation here that the

City exposed Singletary to a foreseeable risk of harm from a third party or external force, but

rather that state actors – the Defendant Officers – were directly responsible for Singletary's

death.[11]  *See, e.g. Hernandez v. City of Boston*, No. 16-10797, 2017 U.S. Dist. LEXIS 62771 *

15 (Mass. D. April 25, 2017) (evening assuming this doctrine applied, it is inapposite and does

---

[11] *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1209 (3d Cir. 1996) illustrates a state-created
danger claim. In that case, a police officer detained a woman, separated her from the man who
was safely escorting her, and sent her home alone in a seriously intoxicated state in the cold
weather.  *Id.* at 1203. She never made it home, however, and was found dead at the bottom of an
embankment.  *Id.* The court found that the police officer exerted sufficient control over the
women that she was forced to walk home unescorted while drunk which foreseeably led to her
death. *Id.* at 209.

not apply where the allegations are that the state caused the decedents death, not a third party).

That type of claim is governed by excessive force jurisprudence and the *Monell* doctrine.  But

even assuming the state-created danger doctrine applies in this context, Plaintiffs have not put

forth evidence to satisfy the "shocks the conscious" or deliberate indifference standard.  Thus,

the Court will grant the Defendants' Motion for Summary Judgment on Plaintiffs' state-created

danger claim.

V.    **CONCLUSION**

      For the reasons discussed above, the Court will deny in part and grant in part Defendants'

Motion for Summary Judgment.  An appropriate Order will follow.


**IT IS SO ORDERED.**


                     **BY THE COURT:**


                      /s/ John Milton Younge_____
                     **Judge John Milton Younge**